**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------- X
LON NEGRIN, FUSION S.A., AND TOP OF :
PRODUCTIONS, LLC,                    :
                                     :
                  Plaintiffs,        :     09 Civ. 6234
                                     :     **Opinion & Order**
          v.                         :
                                     :
IRWIN KALINA AS ADMINISTRATOR OF     :
THE ESTATE OF ROBERT KALINA, DAVID   :
PEELER, AND MOBAY SPORTSWEAR, INC.,  :
                                     :
                  Defendants.        :
---------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/15/10

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

     Before the Court is a motion to dismiss Plaintiffs'

complaint filed by Irwin Kalina as Administrator of the

Estate of Robert Kalina, David Peeler, and Mobay

Sportswear, Inc. ("Defendants"). In the alternative,

Defendants move to stay this action pending the outcome of

related proceedings in Nicaragua. For the reasons set

forth below, Defendants' motions are DENIED.

## BACKGROUND[1]

     This action arises out of an agreement by three

Americans to form and operate a Nicaraguan garment screen-

printing business. In 2005, Lon Negrin, an American

---

[1] The following facts are taken from the allegations in the Complaint.
They are assumed to be true for purposes of these motions.

businessman with extensive experience in the garment
manufacturing and finishing industry, founded Fusion, S.A.
("Fusion"), a Nicaraguan garment manufacturing and
finishing company with offices in New York City. (Compl. ¶
2.) Negrin is also a principal of another garment
production business, TOP of Productions, LLC ("TOP"), a New
Jersey company with a principal place of business in New
York, New York. (Id.)

In 2005, Negrin, through Fusion, acquired various
screen printing machines. (Compl. ¶ 18.) Because Negrin
did not have experience in the screen printing and
embellishment aspects of the garment manufacturing
business, he sought a partner with expertise in those
areas. (Id.) In March 2006, Negrin met Robert Kalina
("Kalina"), a resident of North Carolina, and they
discussed whether Kalina might invest with Negrin in a
Nicaraguan screen printing business. (Compl. ¶ 19.) In
April and May 2006, Negrin (from his office in Manhattan)
spoke to Kalina (in North Carolina) about the venture.
(Compl. ¶¶ 20-21.) Kalina then traveled to Nicaragua with
Negrin to visit Negrin's facility, which included four
screen-printing machines, three dyers, three automatic
garment folders, two forklifts, seven-hundred roller
screens and other equipment. (Compl. ¶ 22.) In addition,

2

there was a sewing operation behind a wall and gate that was "separate and distinct from the contemplated screen printing venture." (Id.) According to the Complaint, Kalina was impressed by the operation and he returned to Nicaragua with David Peeler (also a North Carolina resident) on or about July 10, 2006 to inspect the facility again. (Compl. ¶ 24.)

Subsequently, Negrin, Kalina and Peeler decided to create a garment screen-printing business based in Nicaragua called Fusion Embellishment, S.A. ("Embellishment"). (Compl. ¶ 3.) The parties agreed that Negrin would own fifty percent of Embellishment's stock and Kalina and Peeler would each own twenty-five percent. (Id.) The parties also agreed that the operations of Embellishment would be conducted initially as a division of Negrin's existing company, Fusion, in order to benefit from Fusion's privileged status under Nicaragua's Free Trade Zone laws. (Compl. ¶¶ 4, 25.)

On July 12, 2006, Negrin, Kalina and Peeler executed two agreements concerning the funding and operation of Embellishment. (Compl. ¶ 24.) The first agreement was a "Letter of Confirmation" outlining Embellishment's funding.[2]

---

[2] Under the Letter of Confirmation, Kalina and Peeler would invest $500,000 in Embellishment and Negrin, through Fusion and TOP, would

3

The second agreement was a "Constitución de Sociedad Anónima y Estatutos" ("Articles of Incorporation and Bylaws").[3] Plaintiff TOP and Defendant Mobay Sportswear, Inc. ("Mobay")--a North Carolina garment manufacturing and finishing corporation owned by Kalina and Peeler--were not parties to these agreements. Plaintiff Fusion was also not a party to the agreements, although, as discussed, it was contemplated that the operations of Embellishment would be conducted initially as a division of Fusion. (Compl. ¶¶ 4, 13.)

The Articles of Incorporation and Bylaws contains the following arbitration clause:

> CLAUSE SEVENTEEN (ARBITRATION): Any dispute arising amongst the shareholders, in relation to the distribution of profits, non-performance, non-compliance of prohibitions contained in the bylaws, unfair competition and liquidation, shall be settled by mediation or arbitration, through the Mediation and Arbitration Center of the National Chamber of Commerce of Nicaragua located in Managua, all in accordance with Mediation and Arbitration Act 540, published in Official Gazette number one hundred twenty-two of June twenty-fourth of two thousand five.

---

transfer the screen-printing equipment and would sub-lease factory space in the Fusion facility to Embellishment. (Compl. ¶ 26.)
[3] Both agreements were drafted in Spanish and translated into English for the parties' signatures. (John H. Cobb Decl. Exs. B, C & D.) The Court may consider these documents without converting Defendants' motion to dismiss into a motion for summary judgment because they are incorporated by reference in the Complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

4

(Cobb. Decl. Ex. D.)[4]

In August 2006, Kalina and Peeler flew to New York to
meet with Negrin.  During their meeting it was agreed that
Kalina would be responsible for production in Nicaragua and
general bookkeeping, Negrin would be responsible for
managing Embellishment's Nicaraguan personnel and Peeler
would be responsible for design and sampling.  (Compl. ¶
28.)  Negrin, Kalina and Peeler also agreed that Mobay
would: provide sample making, artwork and personnel support
for Embellishment; handle design, sampling and accounting
issues for Embellishment; and pay ink suppliers directly
and seek reimbursement from Embellishment.  (Compl. ¶ 30.)
At the New York meeting Negrin, Kalina and Peeler also
interviewed an applicant for the plant manager position at
Embellishment.  (Compl. ¶ 29.)

---

[4] The official English version of the Articles of Incorporation and
Bylaws executed by the parties appears to contain translation errors.
It reads as follows:

> TENTH SEVENTH (ARBITRATION):  In the case of conflict among
> the partners as regards distribution of the utilities, no
> fulfillment of the functions, no fulfillment of the
> prohibitions of the bylaws, unfair competition and
> liquidation, the road to solve these problems will be
> through mediation or in its defect for arbitration in which
> was named to the Center of Mediation and Arbitration of the
> National Camera of Trade of Nicaragua in Managua everything
> from conformity to the law 540 of Mediation and
> Arbitration, Gaceta Numbers 122 of June 24, 2005.

(Cobb. Decl. Ex. C.)  In this translation, the word "utilities" is a
mistranslation of "utilidades," the Spanish word for profits.  See
Collins Spanish Dictionary 508 (2d ed. 1993).  The Court takes judicial
notice of the correct translation of these terms, see United States v.
Ovalle, No. 02 CR 975 (LTS), 2003 WL 223588, *4 n. 1 (S.D.N.Y. 2003),
and therefore relies on the certified translation attached as Exhibit D
to the Cobb Declaration.  (The Cobb Declaration was submitted by
Defendants in support of their motion to dismiss.)

5

From approximately September 2006 until January 2007, Kalina traveled to Nicaragua several times to help start up Embellishment. (Compl. ¶ 32.) In or about March 2007, Kalina and Peeler traveled to Manhattan on several occasions to meet with a Mobay sales representative who also represented Embellishment. Negrin organized two of those meetings. (Compl. ¶ 33.) Kalina and Peeler also came to Manhattan in April 2007 for a meeting with the sales representative and to accompany Negrin on behalf of Embellishment to a meeting with representatives of Levi Strauss & Co. in Manhattan. (Compl. ¶ 34.) In June 2007, Kalina and Peeler again traveled to Manhattan to meet with Negrin regarding Embellishment's production of customer samples and orders. (Compl. ¶ 35.) And in August 2008, Peeler met with Negrin in Manhattan to discuss sales strategy for Mobay and Embellishment. (Compl. ¶ 36.)

To help Embellishment "build up its business and expertise to the point where it could begin to solicit and effectively service third-party clients," Kalina and Peeler directed Defendant Mobay Sportswear, Inc., to transfer its production requirements to Embellishment. (Compl. ¶¶ 5, 37.) During 2006 and 2007, Mobay was Embellishment's sole customer. (Compl. ¶ 37.) By the fall of 2008, Embellishment had begun to regularly receive orders from

6

third-party clients, but work for Mobay still made up
approximately ninety-five percent of Embellishment's
orders. (Id.)

However, in September 2008, without explanation or
warning, Mobay stopped placing orders with Embellishment.
(Compl. ¶ 38.) Mobay also imposed an allegedly
unauthorized chargeback to Embellishment in the amount of
$107,000. (Id.) Because Mobay controlled Embellishment's
accounting, it also deducted in excess of $75,000 from
amounts due to Embellishment by Mobay for the payment of
unapproved expense reports. (Compl. ¶ 39.)

Plaintiffs allege that "[t]he actions of Mobay, Kalina
and Peeler resulted in Fusion's inability to pay rent to
its landlord. As a result, Fusion was served with a notice
of default by its landlord who also placed the Nicaraguan
equivalent to liens on three pieces of Fusion's equipment
as security for the rent owed." (Compl. ¶ 40.) To recover
a debt from Fusion, Kalina and Peeler commenced an action
in Nicaragua (the "Nicaragua Action") and, on March 11,
2008, more than four months before this action was filed,
Kalina and Peeler executed a pre-judgment writ of
attachment against Fusion's assets (the "Attachment"),
including its property and shares. (Cobb. Decl. Ex. E.)

7

Without inviting or advising Negrin, Kalina and Peeler met with Fusion's landlord in Nicaragua. (Compl. ¶ 41.) After this meeting, the landlord placed liens on the entire contents of Fusion's factory, including equipment, raw materials and finished goods belonging to Fusion and TOP. (Id.)

According to the Complaint, "[t]he production and screen printing equipment used by [Embellishment], owned in part by TOP and in part by Fusion, previously had been appraised at approximately $1,8000,000 in April 2008," and the balance of the facility's contents were valued at $600,000. (Compl. ¶ 42.) However, the appraiser appointed by the Nicaraguan court valued the contents of the facility at only $243,983.02--the exact amount owed to the landlord for back rent on Fusion's property. (Id.) Plaintiffs allege that "[u]pon information and belief, the court-appointed appraiser is the son of a partner in the entity that was Fusion's landlord." (Compl. ¶ 43.)

An auction of the contents of Fusion's facility was held. (Id.) Although Kalina and Peeler were aware of the auction, they never informed Negrin and Negrin never received notice of it. (Id.) Kalina's lawyer, acting on Kalina's behalf, was the sole bidder at the auction held on January 21, 2009. (Compl. ¶ 44.) His lawyer purchased the

8

contents of the facility for $243,983.02, representing the
amount due to the landlord for back rent. (Id.)

Without Negrin's knowledge or consent, Kalina and
Peeler subsequently signed a new lease with the landlord
and sought to have Fusion and Embellishment evicted from
the premises. (Compl. ¶ 45.) This attempted eviction
interrupted Fusion and TOP's business. (Id.) Plaintiffs
allege that "Kalina informed Fusion's plant management
personnel in Nicaragua that Fusion was 'out-of-business'
and that Kalina would be opening a new business at the
location in [two] weeks. Kalina also offered the existing
Fusion employees jobs with the new business[:] Mobay, S.A."
(Compl. ¶ 46.)

On July 13, 2009, Negrin, Fusion S.A. and TOP
("Plaintiffs") commenced this diversity action, alleging
that "[a]fter Negrin spent months of his time and energy
soliciting customers and booking sales, and with
Embellishment on the verge of substantial success" Kalina
and Peeler, "[t]hrough acts of fraud and deceit,"
wrongfully "oust[ed] Negrin from the business," "deprive[d]
Negrin of the fruits of his labor" and "misappropriated
machinery, raw materials and work in process belonging to
Fusion and TOP." (Compl. ¶ 5.) Specifically, Plaintiffs
allege that "Defendants fraudulently engineered [Fusion's]

inability to pay rent and the placement of liens on all contents of the facility," and then "bid pennies on the dollar to 'purchase' the equipment so as to advance their ongoing scheme to take over the entire business operation in the same location using the same equipment, without Negrin's involvement and to the detriment of the owners of the equipment, Fusion and TOP." (Compl. ¶ 49.) Based on these allegations, Plaintiffs assert five causes of action: breach of fiduciary duty, unjust enrichment, tortious interference with contract, fraud and conversion. (Compl. ¶¶ 50-75.)

Defendants move to dismiss the Complaint on the grounds that: (1) the dispute must be submitted to arbitration; (2) the action should be dismissed under the doctrine of forum non conveniens; and (3) the action should be dismissed as a matter of international comity. In the alternative, Defendants move to stay the action pending the completion of the Nicaragua Action.

After briefing was completed, the parties updated the Court on the status of the Nicaragua Action. Kalina and Peeler's lawsuit was dismissed on May 6, 2010 because it did not comply with certain technical requirements of Nicaraguan civil procedure. (Rizo Aff. ¶ 14.) However, as permitted by Nicaraguan law, on May 19, 2010, Peeler filed

10

another embargo attaching Fusion's assets and, on May 21,
2010, Peeler filed a new lawsuit against Fusion.   (Rizo
Aff. ¶¶ 20-23.)

## DISCUSSION

### I. Arbitration

Defendants contend that the Court should dismiss this
action due to the binding arbitration provision in the
Articles of Incorporation and Bylaws.   They argue that it
is uncontested that the arbitration clause satisfies the
requirements for enforcement under the 1958 Convention on
the Recognition and Enforcement of Foreign Arbitral Awards
and the Federal Arbitration Act, and that the broad
arbitration clause encompasses Plaintiffs' claims.
Plaintiffs respond that the arbitration clause is narrow
and does not encompass their claims.   Also, Plaintiffs
argue that two Plaintiffs--Fusion and TOP--cannot be bound
to arbitrate their claims because they did not sign the
Articles of Incorporation and Bylaws.

As it is undisputed that there is a valid agreement to
arbitrate, the Court must determine "whether the particular
dispute sought to be arbitrated falls within the scope of
the arbitration agreement." Hartford Acc. and Indem. Co.
v. Swiss Reinsurance Amer. Corp., 246 F.3d 219, 226 (2d

11

Cir. 2001). Because there is "a strong federal policy favoring arbitration . . . where, as here, the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002) (internal quotation marks and citations omitted). However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001).

The Second Circuit has established a three-part inquiry for determining whether a particular dispute falls within the scope of an arbitration agreement. First, "a court should classify the particular clause as either broad or narrow." Id. Second, if the clause is narrow, "the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." Id. (internal quotation marks omitted). "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." Id. Third, if the arbitration clause is broad, "there arises a presumption of

12

arbitrability and arbitration of even a collateral matter
will be ordered if the claim alleged implicates issues of
contract construction or the parties' rights and
obligations under it." Id. (internal quotation marks
omitted).

An arbitration clause is broad if "the language of the
clause, taken as a whole, evidences the parties' intent to
have arbitration serve as the primary recourse for disputes
connected to the agreement containing the clause." Id. at
225. On the other hand, a clause is narrow if "arbitration
was designed to play a more limited role in any future
dispute." Id. "No fixed rules govern the determination of
an arbitration clause's scope; while very expansive
language will generally suggest a broad arbitration clause,
[the Second Circuit has] also found broad clauses when
examining phrasing slightly more limited." Louis Dreyfus
Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d
218, 225 (2d Cir. 2001) (internal citations omitted).

Clause seventeen of the Articles of Incorporation and
Bylaws is a narrow arbitration clause. It mandates that
"[a]ny dispute arising amongst the shareholders, in
relation to the distribution of profits, non-performance,
non-compliance of prohibitions contained in the bylaws,
unfair competition and liquidation, shall be settled by

13

mediation or arbitration . . . ." (Cobb. Decl. Ex. D.) In
contrast to expansive language that is the hallmark of a
broad arbitration clause, see, e.g., Collins & Aikman
Products Co. v. Building Sys., Inc., 58 F.3d 16, 20 (2d
Cir. 1995) ("The clause in this case, submitting to
arbitration '[a]ny claim or controversy arising out of or
relating to th[e] agreement,' is the paradigm of a broad
clause."), the arbitration clause here refers to certain
subsets of covered disputes--e.g., disputes over profit
distribution or non-compliance with the bylaws. "The
parties' use of precise language in the arbitration clause
suggests an intent to limit arbitration to a particular
subset of disputes." Fabry's S.R.L. v. IFT Intern., Inc.,
No. 02 Civ. 9855(SAS), 2003 WL 21203405, at *5 (S.D.N.Y.
May 21, 2003).

Because the arbitration clause is narrow, the next
question is "whether the dispute is over an issue that is
on its face within the purview of the clause, or over some
collateral issue that is somehow connected to the main
agreement that contains the arbitration clause." Louis
Dreyfus Negoce, 252 F.3d at 224 (internal quotation marks
omitted). "[A] collateral matter will generally be ruled
beyond its purview." Id.

14

This dispute arises out of an alleged conspiracy to destroy Plaintiffs' business by encouraging a creditor to withhold a substantial payment, thereby triggering an eviction action and a seizure of Plaintiffs' assets. Plaintiffs bring claims for breach of fiduciary duty, unjust enrichment, tortious interference with contract, fraud and conversion. (Compl. ¶¶ 50-75.) Defendants argue that all of the causes of action arise out of either the Articles of Incorporation and Bylaws (breach of fiduciary duty and fraud), distribution of profits under the Contract (unjust enrichment and conversion), or unfair competition (tortious interference)--all areas subject to arbitration. (Defs.'s Mem. in Support of Motion to Dismiss 7.)

The Court disagrees. The Articles of Incorporation and Bylaws is an agreement among shareholders concerning the formation and structure of Embellishment, and the distribution of its profits. The arbitration clause covers disputes relating to the "distribution of profits," but it is not alleged that Defendants' miscalculated or misappropriated Embellishment's profits. (In fact, it is alleged that Defendants impeded Embellishment's ability to earn profits.) The arbitration clause covers disputes relating to "liquidation," but it is not alleged that Embellishment was liquidated. The arbitration clause

15

covers disputes relating to "non-performance" and "non-compliance of prohibitions contained in the bylaws," but it is not alleged that Defendants failed to discharge or abide by any obligation under the Articles of Incorporation and Bylaws. Therefore, the Court agrees with Plaintiffs that none of their causes of action involves a dispute between Embellishment's partners over the distribution of profits or fulfillment of corporate functions. As such, the disputes in this action do not fall within the purview of the arbitration clause.[5]

## II. **Forum Non Conveniens**

Defendants next argue that the action should be dismissed under the doctrine of forum non conveniens.

"The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947). "Forum non conveniens is a discretionary device permitting a court in rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.'" Wiwa v. Royal Dutch

---

[5] Given this ruling, the Court need not determine whether Fusion and TOP, non-signatories to the Articles of Incorporation and Bylaws, may nevertheless be bound by it.

16

Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000) (quoting PT

United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 73

(2d Cir. 1998)). Dismissal is usually not appropriate

unless "the balance of convenience tilts strongly in favor

of trial in the foreign forum." R. Maganlal & Co. v. M.G.

Chem. Co., 942 F.2d 164, 167 (2d Cir. 1991).

    Dismissal pursuant to forum non conveniens requires a

defendant to demonstrate that an adequate alternative forum

exists. See Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41,

46 (2d Cir. 1996). If another adequate forum is available,

the court then considers the Gilbert public and private

interest factors. See Bank of Credit & Commerce Int'l

(Overseas) Ltd. v. State Bank of Pakistan, 273 F.3d 241,

246 (2d Cir. 2001); Wiwa, 226 F.3d at 100. Analyzing those

factors, a court must determine whether a trial in the

plaintiff's chosen forum would either create

"oppressiveness and vexation for the defendants out of

proportion to plaintiffs' convenience," or be inappropriate

because of "considerations affecting the court's own

administrative and legal problems." Piper Aircraft v.

Reyno, 454 U.S. 235, 241 (1981) (internal quotation marks

omitted).

A. Adequate Alternate Forum

17

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003). Whether the law of the foreign forum differs from American law "should ordinarily not be given conclusive or even substantial weight" in assessing the adequacy of the forum. Piper, 454 U.S. at 249.

The parties vigorously contest whether Nicaragua is an adequate alternate forum. Plaintiffs contend that the Nicaraguan judiciary is so permeated with fraud, corruption and extortion that Plaintiffs would be denied due process if forced to litigate there. Defendants respond that several district courts have found Nicaragua to be an adequate alternate forum.

The Court need not decide whether Nicaragua is an adequate alternate forum because, as discussed below, Plaintiffs' choice of forum and the Gilbert factors weigh in favor of retaining jurisdiction. Therefore, the Court assumes for the purposes of this motion that Nicaragua would be an adequate alternate forum. See Int'l Equity Investments, Inc. v. Cico, 427 F. Supp. 2d 503, 506-07 (S.D.N.Y. 2006) ("[A]ssuming arguendo that Brazil is an available alternative forum, defendant's motion to dismiss

18

on the ground of <u>forum non conveniens</u> nevertheless is
denied" because "[t]he public interest factors tend to
favor plaintiffs and certainly do not favor defendant" and
"[t]he private interest factors do not cut strongly in any
direction."); <u>Eclaire Advisor Ltd. as Trustee to Daewoo</u>
<u>Int'l (America) Corp. Creditor Trust v. Daewoo Eng. &</u>
<u>Constr. Co., Ltd.</u>, 375 F. Supp. 2d 257, 265 (S.D.N.Y. 2005)
(assuming that Korea is adequate alternate forum and
concluding that neither public nor private <u>Gilbert</u> factors
warrants disturbing plaintiff's choice of forum); <u>see also</u>
<u>O'Donnell v. Club Mediterranee S.A.</u>, No. 05-CV-610(ARR),
2008 WL 794975, *12 (E.D.N.Y. Mar. 24, 2008) ("It is not
necessary to get caught up in analyzing the forum's
adequacy in this case, however, as the <u>Gilbert</u> factors are
dispositive of the forum non conveniens issue.") (internal
quotation marks and alterations omitted); <u>Metito (Overseas)</u>
<u>Ltd. v. General Elec. Co.</u>, No. 05 Civ. 9478(GEL), 2006 WL
3230301, *4 (S.D.N.Y. Nov. 7, 2006) ("The Court likewise
need not decide whether an adequate alternative forum
exists, because . . . even assuming defendant is correct
that such a forum exists in the U.A.E., defendant has
failed to demonstrate that the balance of public and
private interest factors weighs strongly enough in its

favor to overcome the deference due to plaintiff's choice
of forum.")

### B. Balance of Private and Public Interest Factors

1. Plaintiffs' Choice of Forum

Having assumed that Nicaragua is an adequate alternate
forum, the Court must weigh the Gilbert public and private
interest factors to determine which forum "will be most
convenient and will best serve the ends of justice."
Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir.
1996). This analysis affords domestic plaintiffs "a strong
presumption" that their forum choice is sufficiently
convenient, although this is not always so. Pollux Holding
Ltd., 329 F.3d at 70. This presumption of convenience is
accorded to domestic plaintiffs because it is less likely
that the choice to bring suit in their home district will
be based on improper motives such as "forum shopping for a
higher damage award or for some other litigation
advantage." Id. at 71. However, the presumption is
lessened when the dispute involves transactions, witnesses,
and evidence abroad. See Base Metal Trading SA v. Russian
Aluminum, 253 F. Supp. 2d 681, 693-94 (S.D.N.Y. 2003). In
short, courts need not assign "'talismanic significance to
the citizenship or residence of the parties,' and there is
no inflexible rule that protects U.S. citizen or resident

plaintiffs from having their cases dismissed for <u>forum non</u> <u>conveniens</u>."  <u>Pollux</u>, 329 F.3d at 73 (quoting <u>Alcoa</u> <u>Steamship Co., Inc. v. M/V Nordic Regent</u>, 654 F.2d 147, 154 (2d Cir. 1980) (en banc)).

 Here, Plaintiff Negrin is a U.S. citizen.  Negrin is also a principal of Plaintiff Fusion, a Nicaraguan company with offices in New York City, and Plaintiff TOP, a New Jersey limited liability company with a principal place of business in New York City.  As a U.S. plaintiff, Negrin's choice of a domestic forum near the principal places of business of two other plaintiffs in this lawsuit is entitled to a presumption that it is sufficiently convenient and not motivated by forum shopping.  See <u>Pollux</u> <u>Holding Ltd.</u>, 329 F.3d at 70-71.

 It is true that in the Second Circuit, the deference accorded to a plaintiff's choice of forum is diminished when "plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts."  <u>Guidi v. Inter-</u> <u>Continental Hotels Corp.</u>, 224 F.3d 142, 147 (2d Cir. 2000). And a plaintiff's choice of forum is also given "reduced emphasis" where, as here, "the operative facts upon which the litigation is brought bear little material connection to the chosen forum."  <u>Nieves v. Am. Airlines</u>, 700 F. Supp. 769, 772 (S.D.N.Y. 1988).  The Court therefore concludes

that while Plaintiffs' choice of forum is entitled to some deference, "it does not operate at full strength." LaSala v. UBS, AG, 510 F. Supp. 2d 213, 224 (S.D.N.Y. 2007).

2. The Gilbert Factors

The Gilbert public interest factors include (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding problems in conflict of laws and the application of foreign law. Gilbert, 330 U.S. at 508-09; Iragorri v. United Technologies Corp., 274 F.3d 65, 74 (2d Cir. 2001). The Gilbert private interest factors include ease of access to evidence, cost for witnesses to attend trial, availability of compulsory process, and other factors that might shorten trial or make it less expensive. See Piper, 454 U.S. at 241 n. 6. "Application of the factors enunciated in Gilbert varies depending on the unique facts of each case; the inquiry is intended to be flexible, with no particular emphasis on any single factor." Doe v. Hyland Therapeutics Div., 807 F. Supp. 1117, 1121 (S.D.N.Y. 1992) (internal citations omitted).

The public Gilbert factors weigh in favor of retaining jurisdiction. Among other things, the United States has an

interest in this dispute as it involves an alleged ouster
of a U.S. citizen's interest in a business through the
fraud and deceit of other U.S. citizens.  In addition, this
suit would not unfairly impose jury duty on a community
which has "no relation to the litigation," Gilbert, 330
U.S. at 508-09, in light of Kalina and Peeler's repeated
trips to New York to form Embellishment and in light of
Negrin's citizenship and the principal places of business
of Fusion and TOP.[6]  Although the fact that the law of
Nicaragua may be involved is a complicating factor, it does
not appear that the issues of Nicaraguan law that are
likely to arise are very difficult.  "Besides, the courts
of this District are very well experienced in the
determination and application of foreign laws, since so
much of the commercial activity of this District involves
foreign commerce."  Eclaire Advisor Ltd. as Trustee to
Daewoo Int'l (America) Corp. Creditor Trust v. Daewoo Eng.
& Constr. Co., Ltd., 375 F. Supp. 2d 257, 265 (S.D.N.Y.
2005).

---

[6] While the Court gives reduced deference to Plaintiffs' choice of a
U.S. forum because "the operative facts upon which the litigation is
brought bear little material connection to the chosen forum," Nieves,
700 F. Supp. at 772 (emphasis added), given the connections with the
United States discussed above, the Court cannot say that the United
States has "no relation to this litigation." Gilbert, 330 U.S. at 508-
09 (emphasis added).

The private Gilbert factors also tilt in favor of Plaintiffs' chosen U.S. forum. Negrin, Kalina and Peeler are (or were) U.S. citizens, Plaintiffs Fusion and TOP have principal places of business in the United States, and Defendant Mobay is a North Carolina corporation. Therefore, documentary evidence and many witnesses will likely be available in the United States. Moreover, to the extent that evidence or witnesses are located abroad, "[i]n this day and age of rapid transportation and instant communications, the convenience of immediate physical proximity to documents, testimony, and other proof has become of less consequence to a forum non conveniens analysis . . . ." Id.; see also Calavo Growers of Cal. v. Generali Belgium, 632 F.2d 963, 969 (2d Cir. 1980) (Newman, J., concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meanings of 'non conveniens.'"). Taking all these factors together, as well as the other considerations advanced in the parties' submissions, the Court concludes that the private interest factors tip in Plaintiffs' favor.

"Unless the balance of convenience is strongly in favor of the defendant, the plaintiff's choice of forum

24

should not, or should rarely, be disturbed." 1A Federal Procedure, Lawyer's Ed. § 1:837 (2010). As the Court gives some deference to Plaintiffs' choice of forum and because the public and private Gilbert factors tilt in Plaintiffs' favor, the Court concludes that this action should not be dismissed under the doctrine of forum non conveniens.

## III. International Comity

Finally, Defendants argue that this action should be dismissed as a matter of international comity. They assert that Nicaragua is a more convenient forum for resolving Plaintiffs' claims and point to the Nicaragua Action as a first-filed, parallel proceeding to which this Court should defer.

"International comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." Pravin Banker Assocs. Ltd. v. Banco Popular del Peru, 109 F.3d 850, 854 (2d Cir. 1997) (internal quotation marks omitted). Under these principles, "United States courts 'ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries . . . .'" Jota v. Texaco, Inc., 157 F.3d 153, 159-60 (2d Cir. 1998) (quoting Pravin, 109 F.3d at 854); see also JP Morgan Chase

Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418,
422 (2d Cir. 2005) ("[I]nternational comity is clearly
concerned with maintaining amicable working relationships
between nations.")

"[C]omity of the courts" is a set of "principles
whereby judges decline to exercise jurisdiction over
matters more appropriately adjudged elsewhere." Hartford
Fire Ins. Co. v. California, 509 U.S. 764, 817 (1993)
(Scalia, J., dissenting in part). To justify abstention
under these principles, the foreign proceedings must be
parallel, the alternative forum must be adequate, and
"additional . . . circumstances must be present . . . that
outweigh [courts'] general obligation to exercise their
jurisdiction." Royal & Sun Alliance Ins. Co. of Canada v.
Century Int'l Arms, Inc., 466 F.3d 88, 94-96 (2d Cir.
2006). In connection with this analysis, courts must
display "proper respect for litigation in and the courts of
a sovereign nation," fairness to litigants, and judicial
efficiency. Id. at 94. Other relevant factors include
"the similarity of the parties, the similarity of the
issues, the order in which the actions were filed . . . ,
the potential prejudice to either party, the convenience of
the parties, the connection between the litigation and the

United States, and the connection between the litigation and the foreign jurisdiction." Id.

The Court declines Defendants' invitation to dismiss this action as a matter of international comity. First, the Nicaragua Action is not parallel to this action. The former was instituted to recover a debt from Fusion, while the latter asserts tort, fraud and quasi-contract claims arising from Defendants' alleged ouster of Negrin's business interests and the misappropriation of his property. While the Court has assumed that Nicaragua is an adequate alternate forum, there are no additional circumstances that outweigh the Court's general obligation to exercise its jurisdiction. See id. at 94-96. The Nicaragua Action involves Negrin, Kalina and Fusion, and therefore there is some similarity of the parties (although this action involves three additional parties). However, the issues raised in each action are distinct. Moreover, while the Nicaragua Action was originally filed before this action, it was dismissed in May 2010 and re-filed on May 19, 2010. Therefore, this action is first-filed. In addition, as discussed above, there is at least some connection between this action and the United States. Finally, the parties will not be unduly inconvenienced by proceedings in the United States because documentary

evidence and many witnesses are likely located or
obtainable here.  Based on these considerations, the Court
declines to dismiss this action as a matter of
international comity.

## IV. Motion to Stay

The Court also denies Defendants' motion to stay this
action pending the completion of the Nicaragua Action.
Such a stay would not permit the Court to decide whether
the Nicaragua Action would be an efficient vehicle for
fairly resolving all the rights of the parties to this
action because, as discussed, the issues raised in the
actions are dissimilar.  See Royal & Sun Alliance Ins. Co.,
466 F.3d at 96 (advising district court to consider whether
a "measured temporary stay" might "permit the district
court a window to determine whether the foreign action will
in fact offer an efficient vehicle for fairly resolving all
the rights of the parties").  Therefore, a stay is
unwarranted.

## CONCLUSION

For the reasons set forth above, Defendants' motion to
dismiss is DENIED and Defendants' motion to stay this
action pending the outcome of the Nicaragua Action is
DENIED.

**SO ORDERED:**

Barbara S. Jones
UNITED STATES DISTRICT JUDGE

Dated:      New York, New York
            July 14 , 2010