UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LON NEGRIN,                                          :

                    Plaintiff,           :

      -against-                                       :    **REPORT AND RECOMMENDATION**

IRWIN KALINA, Appointed Administrator   :     09 Civ. 6234 (LGS)(KNF)
of the Estate of Robert Kalina,
                                             :
                    Defendant.
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE LORNA G. SCHOFIELD, UNITED STATES DISTRICT JUDGE

      Lon Negrin ("Negrin") commenced this action seeking damages for breach of fiduciary duty, unjust enrichment, tortious interference with contract, fraud and conversion. On November 19, 2012, Negrin's motion for judgment by default was granted in an amount to be determined by inquest. Before the Court are the plaintiff's unopposed inquest submissions. The plaintiff seeks $3,916,917.

**FACTS DEEMED ADMITTED**

      The following facts, based on the well-pleaded allegations, are deemed admitted by the defendant:

      In 2005, Negrin founded Fusion S.A. ("Fusion"), in Nicaragua, to manufacture garments for sale in the United States. He was also a principal of Top of Production, LLC ("Top"), a company engaged in the garment production industry. Negrin acquired screen printing machinery, including four screen printers, three dryers, two forklifts, three automatic garment folders and 700 roller screens. In 2006, Negrin met Robert Kalina ("Kalina") and they discussed

the possibility of Kalina's investing with Negrin to start a screen printing business in Nicaragua. Kalina owned Mobay Sportswear, Inc. ("Mobay") with David Peeler ("Peeler").

On July 12, 2006, after Kalina and Peeler visited Fusion and inspected the screen printing equipment in Nicaragua, Negrin, Kalina and Peeler entered into an agreement creating Fusion Embellishment, S.A. ("Embellishment"), with Negrin owning 50%, and Kalina and Peeler owning 25% each. To be able to operate under Nicaragua laws, Embellishment needed to obtain Free Trade Zone status. Negrin formed a division within Fusion called Fusion Embellishment ("the Embellishment Division"), so the screen printing business could operate under Fusion's Free Trade Zone status while Embellishment was waiting to obtain Free Trade Zone status. The parties memorialized their intention to proceed in this fashion by a letter agreement, dated July 12, 2006. Kalina was responsible for completing the Free Trade Zone application for the screen printing business. The Free Trade Zone status was never obtained by Embellishment.

The July 12, 2006 letter agreement required Kalina and Peeler to invest $500,000 in the Embellishment Division for its operations. The investment would be transferred to Embellishment upon its approval, by the Nicaraguan government, to commence business through the Embellishment Division, without having secured Free Trade Zone status. The July 12, 2006 letter agreement required Negrin, through Fusion and Top, to transfer the screen printing equipment and to sublease factory space in the Fusion facility to the Embellishment Division. Kalina and Peeler invested $500,000 in the Embellishment Division, as agreed.

In August 2006, the parties discussed the logistics of operating the Embellishment Division and Embellishment. They agreed that Kalina would be responsible for production in Nicaragua and general bookkeeping for the Embellishment Division. Negrin would be responsible for managing the Nicaraguan personnel. Peeler would be responsible for designs

and sampling. Negrin and Kalina would share responsibility for marketing and budgeting. The parties also agreed that Mobay would: (1) fabricate samples and provide artwork and personnel support for certain Embellishment Division and Embellishment logistical and operational needs; (2) handle the Embellishment Division's accounting needs remotely, over the internet, from its offices in North Carolina, using QuickBooks Online; and (3) pay ink suppliers directly, and the Embellishment Division would reimburse Mobay. Moreover, Mobay would produce pre-production strike-offs for the Embellishment Division's customers using Mobay's equipment.

In 2007, Kalina and Peeler met, in New York County, with a Mobay sales representative, who also represented the Embellishment Division, and with a company called Tee Rex. Thereafter, Kalina and Peeler met with Negrin, and the parties met with Tee Rex and the representatives of a customer, T-Ink. Tee Rex agreed to send a technician to Mobay to assist with fabricating the samples that Mobay would produce on the Embellishment Division's behalf, because Mobay was not producing the samples properly. During a meeting in 2008, the parties agreed that Bill Pellegrini would act as a salesman for the Embellishment Division, in addition to performing his Mobay duties. During 2006 and 2007, Mobay was the Embellishment Division's only customer. By the Fall of 2008, the Embellishment Division started receiving orders from other customers, but its work for Mobay still comprised approximately 95% of its production.

In September 2008, without an explanation or warning, Mobay stopped placing orders with the Embellishment Division. Mobay also imposed a chargeback on the Embellishment Division without Negrin's approval. Mobay alleged that the chargeback resulted from a problem with color matching on finished garments. However, the color matching problem was caused by changes made to the Embellishment Division's ink system, by Mobay, without Negrin's consent. Prior to these changes, Mobay did not experience color match problems and accepted all goods

from the Embellishment Division, without complaint.  Mobay also deducted money from the Embellishment Division's account to pay unapproved expense reports, without Negrin's knowledge or consent.  In addition, Mobay failed to pay the Embellishment Division for certain seconds and overruns in 2007 and 2008.

As a result of Mobay's conduct, Fusion was unable to pay rent and was served with a default notice by its landlord, who placed a lien on three pieces of Fusion's equipment as security for the rent owed.  Without Negrin's knowledge, Kalina and Peeler met with Fusion's landlord in Nicaragua, after which the landlord placed liens on the entire content of Fusion's factory, including equipment, raw materials and finished goods belonging to Fusion and Top.

The production and screen printing equipment used by the Embellishment Division, owned in part by Top and in part by Fusion, had been appraised in April 2008.  However, the appraiser appointed subsequently by a Nicaraguan court valued the content of the facility, including the raw materials, equipment, certain finished goods and work in process at a significantly lower amount.  The court-appointed appraiser is the son of a partner in the entity that was Fusion's landlord.  Based on this low appraisal, an auction was held, on January 21, 2009, to liquidate the content of the Fusion facility.  Kalina and Peeler were aware of the scheduled auction, but neither they nor Fusion's landlord or the court informed Negrin, Fusion or Top of the auction.  Kalina's attorney, acting on Kalina's behalf, was the only bidder at the January 21, 2009 auction, and he purchased the entire content of the factory for an amount representing the amount due to the landlord for unpaid rent.  Without Negrin's knowledge, Kalina and Peeler signed a new lease with the landlord and sought to have Fusion and the Embellishment Division evicted from the premises.  Negrin, Fusion and Top never received an eviction notice.  Kalina informed Fusion's plant manager that Fusion was out-of-business and

that Kalina would be opening a new business, in two weeks, at that location. Kalina offered the existing Fusion employees jobs with the new business named Mobay, S.A. ("Mobay, S.A."). Kalina and Peeler refused to permit Fusion and its agents entry into the factory to retrieve Fusion's property, despite a Nicaraguan court order directing same. Fusion was permitted to enter the factory only after the intervention of the Nicaraguan customs department and local police officials.

## PLAINTIFF'S INQUEST SUBMISSIONS

Negrin seeks $3,916,917 in damages. In support of his request, Negrin submitted proposed findings of fact and conclusions of law and an "Inquest Memorandum and Affidavit." Attached to the affidavit are exhibits, including: (1) Exhibit A (photographs of the electrical and equipment print plant installation); (2) Exhibit B ("Summarize of Corporation Contract," dated July 12, 2006 and signed by Negrin, Kalina and Peeler); (3) Exhibit C (December 2008 e-mail messages to and from Negrin); (4) Exhibit D (an e-mail message dated January 26, 2009); (5) Exhibit E (certain e-mail messages from 2009); (6) Exhibit F (a March 4, 2009 e-mail message from Consuelo Benedicto to Negrin); (7) Exhibit G (photographs and documents in the Spanish language); (8) Exhibit H (a "1/27/09" e-mail message); (9) Exhibit I (photographs of "the Court Notice Board in the Courthouse of Tipitapa"); (10) Exhibit J (a "1/27/09" e-mail message); (11) Exhibit K (a "2/4/09" e-mail messages between Kalina and Pablo Cruz); (12) Exhibit L (Fusion's property evaluation in the Spanish language, dated "01 de Abril de 2008"); (13) Exhibit M (Fusion's January 13, 2009 "Property Valuation Report" by Cesar Blandon Gonzalez); (14) Exhibit N ("1/27/09" e-mail messages between Kalina and Pablo Cruz); (15) Exhibit O ("1/27/09" and "1/28/09" e-mail messages between Kalina and Pablo Cruz); (16) Exhibit P ("1/27/09" and "1/28/09" e-mail messages between Kalina and Pablo

Cruz); (17) Exhibit Q ("Record of Possession" by Augusto Blandon Gonzalez on January 14, 2009); (18) Exhibit R (""3/6/09," "3/7/09," and "3/9/09" e-mail messages); (19) Exhibit S (a February 6, 2009 e-mail message from Pablo Cruz); (20) Exhibit T (a "copy of part of the English version of the Mobay, S.A.'s Free Trade Zone Application"); (21) Exhibit U ("3/6/09," "3/7/09" and "3/9/09" e-mail messages involving Pablo Cruz, David Peeler and Robert Kalina); and (22) Exhibit V (a November 29, 2010 e-mail message from "JSDINV" to Negrin).

Negrin contends that the screen printing equipment, owned by him, was assessed by an independent company at $1,366,732.50. Negrin contends that Mobay, S.A. used "the exact same model with the exact same installation and machinery as Fusion Embellishment, S.A." He asserts that

> [t]he balance sheet and Projection pages of Mobay, S.A.'s Free Trade Zone Application were made by Kalina and show the profit Kalina planned on taking from me. From my experience over the two years working and seeing our screen print plant mature, makes me confident to state Mobay, S.A.'s actual net profit would have been at least 33.34% greater than was stated in those Projections. Mobay, S.A.'s projections are solid profit that Kalina was trying to steal from me, as I was his 50% partner and due 50% of the profits from our screen print company. Kalina was reporting these numbers to the Nicaraguan government to obtain Free Trade Zone permits, which is an indication of the minimum net profits Fusion Embellishment, S.A. was on track to make. I am owed the profits that Kalina stole from me, as forecasted by Kalina himself on the Mobay, S.A. projected Profit and Loss Statement included on the Mobay, S.A. Zona Franca Application.

Negrin contends that he has

> been damaged by the loss of the use of the factory and the equipment and material located therein, the inability to deliver finished orders to customers, and the stolen . . . future profits of the "Embellishment" business. I have limited my request here for damages to the value of my screen print equipment assets, namely $1,366,000, and the loss of my future profits of my Fusion Embellishment, S.A. screen print business from 2009 - 2013 (based on the net profit shown on Mobay, S.A.'s four-year projection using the corrected amounts for 2009 and 2011; $40,800 for 2009, $270,359 for 2010, $455,570 for 2011, $711,556 for 2012, and $1,072,552 for 2013 which total $2,550,917.00. Thus, the total damages I ask from the court to be awarded to myself, Lon Negrin, is $3,916,917.00.

## DISCUSSION

*Legal Standard*

"Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999). Establishing the appropriate amount of damages involves two steps: (1) "determining the proper rule for calculating damages on . . . a claim"; and (2) "assessing plaintiff's evidence supporting the damages to be determined under this rule." Id. Rule 55(b)(2) of the Federal Rules of Civil Procedure "leaves the decision of whether a hearing is necessary[, for determining damages,] to the discretion of the district court" and "as long as . . . there [is] a basis for the damages specified in a default judgment," the court is not required to hold a hearing. Fustok v. Conticommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989). When assessing damages, a court cannot rely on the plaintiff's statement of the damages; rather, damages must be established "with reasonable certainty." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997). State substantive law governs the issue of damages in a case over which a federal court exercises diversity jurisdiction. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 437, 116 S. Ct. 2211, 2224 (1996).

The calculation of damages in breach of fiduciary duty cases is predicated upon the type of misconduct in which the fiduciary engaged. See Estate of Janes, 90 N.Y.2d 41, 55, 659 N.Y.S.2d 165, 172 (1997) (lost-profit measure of damages applies where the fiduciary's misconduct consisted of deliberate self-dealing and faithless transfers of trust property, whereas the value of lost capital is the proper measure of damages when the fiduciary's misconduct is the

negligent retention of the assets that he or she should have sold).  Where fraud is claimed, the measure of damage is "the actual pecuniary loss sustained as the direct result of the wrong." Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996).

***Application of Legal Standard***

The misconduct involved in this action is fraud perpetrated deliberately by Kalina, who owed a fiduciary duty to Negrin, with whom he shared a partnership interest in Embellishment. As a direct result of Kalina's obtaining Negrin's print screen equipment through deliberate fraudulent conduct and breach of a fiduciary duty, Negrin's measure of damages is the value of the print screen equipment, estimated to be $1,366,732.50.  (See Exhibit L).  Moreover, credible evidence of the plaintiff's experience in and knowledge of the screen printing business, makes his request for lost future profits reasonable.  Negrin's measure of lost-profit damages based on Mobay, S.A.'s future net profits, estimated at the time Mobay, S.A. was formed and made its Free Trade Zone Application, in February 2009, (see Exhibit T), is reasonable.  This is so because Mobay, S.A. was a newly formed entity at that time.  Moreover, based on Negrin's experience in the screen printing industry and Fusion's business dealings, his estimate that the future actual net profit would have been at least 33.34% greater than was stated in Mobay, S.A.'s projections appears to be reasonable.  This means that Mobay S.A.'s actual net profit for the years 2009, 2010, 2011, 2012 and 2013 would have been the projected net profit of $2,550,917, plus 33/34% of that amount, which is $850,475.72, bringing the total lost profit for those years to $3,401,392.72.  However, since Negrin held a 50% partnership in Embellishment, he would have been entitled to 50% of the future profit amount, not the entire projected amount of future profit claimed by Negrin.  Accordingly, the Court finds that the proper measure of lost profit is

50% of the total lost profit of $3,401,392.72, namely, $1,700,696.36. The Court finds that Negrin is entitled to damages in the amount of $3,067,428.86.

## RECOMMENDATION

For the foregoing reasons, I recommend that Negrin be awarded damages of $3,067,428.86.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield, 40 Centre Street, Room 201, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Schofield. ***Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.*** See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York  
December 17, 2013

Respectfully submitted,

_Kevin Nathaniel Fox_  
KEVIN NATHANIEL FOX  
UNITED STATES MAGISTRATE JUDGE